1        IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
2        BEFORE THE HONORABLE KIMBERLY J. MUELLER

3

      UNITED STATES OF AMERICA,
4
                    Plaintiff,
5      vs.                          Sacramento, California
                                    No. 2:20-CR-00023
6      LAWRENCE MACKEN,             Monday, July 20, 2020
                                    9:50 a.m.
7                   Defendant.
      _____/
8

9                       --oOo--

10          REPORTER'S TRANSCRIPT OF PROCEEDINGS
          RE: MOTION TO SUPPRESS AND STATUS CONFERENCE
11        (Proceedings held via Zoom video conference.)

12                      --oOo--

13

      APPEARANCES:
14
      For the Government:        UNITED STATES ATTORNEY'S OFFICE
15                               AARON PENNEKAMP
                                 Assistant U.S. Attorney
16                               501 I Street, Suite 10-100
                                 Sacramento, CA  95814
17
      For the Defendant:         OFFICE OF THE FEDERAL DEFENDER
18                               HANNAH LABAREE
                                 Assistant Federal Defender
19                               801 I Street, Third Floor
                                 Sacramento, CA  95814
20
      Official Reporter:         KACY PARKER BARAJAS
21                               CSR No. 10915, RMR, CRR, CRC
                                 UNITED STATES DISTRICT COURT
22                               501 I Street, Suite 4-200
                                 Sacramento, CA  95814
23                               kbarajas.csr@gmail.com

24    *Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.*

25

1          SACRAMENTO, CALIFORNIA, MONDAY, JULY 20, 2020, 9:50 AM

2                              --oOo--

3          THE CLERK:  Calling criminal case 20-23, United States

4    versus Lawrence Macken.  This is on for a status conference and

5    motion hearing.

6          MS. LABAREE:  Your Honor, I'm getting reports that the

7    public line is still really, really hard to hear on.  I have

8    family members phoning in to listen to the Macken hearing.  I'm

9    not sure if there's anything we can do about that, but I did

10   want to put that on the record.

11         THE COURT:  Ms. Schultz.

12         THE CLERK:  I monitor the public line as the

13   proceedings continue.  I just checked it, as Ms. Labaree was

14   saying that, and it's fine through the court's line.  So I call

15   in just like the public and it's clear.  So I don't know if it

16   has to do with the connection or location or something like

17   that.

18         THE COURT:  All right.

19         All right.  If multiple persons, Ms. Labaree, are

20   experiencing that and you can collect detailed information on

21   how they're connecting from where, that will help us, if

22   they're telling you they cannot hear.  I understand your

23   investigator may be trying to monitor.  There's always a

24   transcript of the proceedings that could be made available if

25   needed.

1          MS. LABAREE:  Okay.  Thank you, your Honor.

2          THE COURT:  Are we waiting for Mr. Macken?

3          THE CLERK:  Yes, your Honor.  They're bringing him

4    right now.

5          THE COURT:  All right.

6          THE REPORTER:  Your Honor, could I just interrupt

7    really quickly.

8          THE COURT:  Yes.

9          THE REPORTER:  Could I please, while your Honor is

10   speaking, I need to have everybody muted so I can hear you

11   clearly.

12         THE COURT:  Thank you, Ms. Barajas.  Yes.  Good rule,

13   generally.  So I suppose the best practice is to stay muted

14   until I've called you.  I call on attorneys when I'm ready to

15   hear from them.  So wait for me to call on you and unmute then.

16         All right.  Appearances, please, for the government.

17         MR. PENNEKAMP:  Good morning, your Honor.

18   Aaron Pennekamp for the United States.

19         THE COURT:  Good morning to you.

20         For the defense.

21         MS. LABAREE:  Good morning, your Honor.

22   Hannah Labaree for Mr. Macken.  Mr. Macken is appearing via

23   video teleconference from the United States's Marshal's lockup.

24   He has consented to appearing in this manner as opposed to

25   physical presence.  That's it.

1           THE COURT:  Good morning, Ms. Labaree.

2           Mr. Macken, you can see and hear the Court?

3           THE DEFENDANT:  Yes, I can.  Good morning, your

4   Honor.

5           THE COURT:  All right.  Good morning to you.

6           Ms. Labaree, just to clarify, I don't know that

7   consent is essential or that the Court needs to make

8   particularized findings given the nature of this hearing.  Do

9   you disagree?

10          MS. LABAREE:  I don't.  I just was being extra

11  cautious.

12          THE COURT:  All right.

13          I have a few questions based on the motion that's

14  pending.  First of all, there is a reply that does reply to

15  some of the government's arguments.  Mr. Pennekamp, did you

16  have any focused response to the information in the reply,

17  particularly with respect to standing?  Anything more to say on

18  standing?  Do you believe now the defense has established

19  standing?

20          MR. PENNEKAMP:  Your Honor, we would submit on the

21  question of standing.  Our concern was just that Mr. Macken had

22  not to that point submitted any evidence as to his standing,

23  but for purposes of this motion, we are prepared to submit on

24  that matter.

25          THE COURT:  All right.  Thank you for that

1    clarification.  Then I have a number of questions for each of

2    you regarding the substance of the motion.  So I want to make

3    certain I understand the government's position.  Even though

4    the government does say no arrest, it pivots pretty quickly to,

5    well, if there was an arrest, the government still prevails

6    here because there was probable cause or the vehicle search

7    exception applies.  Are you effectively conceding that there

8    likely was an arrest here, Mr. Pennekamp?

9           MR. PENNEKAMP:  No, not at all, your Honor.  We are

10   making those arguments in the alternative.  Our primary

11   position is that, yes, given the information that the officers

12   knew at the time of the stop and at the time of the search, we

13   believe they did have probable cause justifying an arrest, if

14   it occurred, and we believe they have probable cause justifying

15   the search if the search occurred.  But we don't think the

16   Court needs to reach the probable cause question to decide this

17   motion and resolve it in the government's favor.

18          Our position is and at this point my understanding is

19   that Mr. Macken has conceded that at the very least the

20   officers had reasonable suspicion at the time of the stop and

21   the search that Mr. Macken had a weapon inside his vehicle.

22   And on that basis, as well as for, you know, the additional

23   things that the officers saw following the stop, including

24   Mr. Macken's noncompliance with the officers' commands, the

25   officers were justified in taking the steps that they did

6

1 without those steps resulting in a finding that an arrest

2 occurred at the time of the stop.

3         So we are certainly not conceding that an arrest

4 happened, and we think the Court would be more than justified

5 in finding that in the circumstances of this case that this was

6 entirely consistent with a *Terry* stop.

7         THE COURT:  All right.  Let me just clarify, and then

8 I'll ask Ms. Labaree if she's conceding reasonable suspicion

9 just for clarity.

10        On the arrest, I understand there's no bright line,

11 but I'm assuming you sent me all the cases that I would

12 consider in looking at the fact of Mr. -- I'm sorry -- Macken,

13 Mr. Macken's being handcuffed in the car, the number of

14 minutes, approximately five; do I have that right, in the car

15 before the gun was found.  And also the number of officers,

16 there were quite a few officers here as the defense points out.

17 So have you pointed me to every case that could inform the

18 Court's thinking about whether or not those factors rise to the

19 level of an arrest?

20        MR. PENNEKAMP:  As a general matter, yes, your Honor.

21 I mean, we would specifically point the Court to the Ninth

22 Circuit's most recent decisions in the *United States versus*

23 *Vandergroen* case.  We cited the district court opinion in our

24 brief.  After we filed our brief, the Ninth Circuit resolved

25 the pending appeal in that case, and I think if you look

1   closely at the facts involved in the *Vandergroen* case, which

2   are described at length in the district court opinion, that

3   case is strikingly similar to this one, and the Ninth Circuit

4   affirmed the district court's decision finding that no arrest

5   had occurred and that this was entirely consistent with a *Terry*

6   stop.  So we think that case is directly on point.

7           There is one other case that I was looking at

8   yesterday, another Ninth Circuit case called *United States*

9   *versus Morris*, and you can find that at 417 fed appendix 713.

10  It's another case involving just reports of an individual with

11  a gun, no separate violent act, but the officers used force in

12  *Terry* stopping that person, including handcuffing him, putting

13  him in a vehicle.  I think in that case they even had him laid

14  prone on the ground, and the Ninth Circuit nevertheless held

15  that the circumstances in that case did not rise to the level

16  of an arrest.  So we again think that case supports our

17  position.

18          THE COURT:  Ms. Labaree, do you concede reasonable

19  suspicion, as the government argues, and secondly, any response

20  to *Vandergroen,* if I'm saying that correctly, and *Morris*?

21          MS. LABAREE:  We do concede reasonable suspicion, yes.

22  I recognize that the tip here was reliable as to a former law

23  enforcement officer, and we don't take issue with it.  Our

24  argument is more that the substance of that tip wasn't fully

25  accounted for by the officers, and I think I make that clear in

1   my briefing.  Although, if the Court is interested in that, I'd

2   like to speak more on it because I think it does lie at the

3   crux of this case.  But as a general matter, no, we're not

4   arguing about the reliability of the tip.  We're not arguing

5   about reasonable suspicion that a crime was being committed

6   potentially, right.

7        As to *Vandergroen*, you know, the first thing is that

8   clearly this was filed last week after the reply, and I didn't

9   have a chance to respond in writing to it.  So if that case is

10  going to become the sort of decision point here, I would ask

11  for the opportunity to respond in writing.

12        Another point is that since we aren't challenging the

13  reasonable suspicion, the first *Vandergroen* opinion, since

14  there's these two Ninth Circuit opinions on it, is apropos of

15  nothing here.  So the second one does relate to our case in

16  terms of the issues decided.

17        The Fourth Amendment's touchstone is the totality of

18  the circumstances.  It's reasonableness.  And it's always

19  highly fact specific.  It's not clear to me what arguments the

20  defendant in *Vandergroen* made as to whether they conceded or

21  not that he was cooperative, what extent that cooperation, you

22  know, was or wasn't happening.

23        You know, I looked at the Northern District opinion

24  which has a little bit of a greater explanation of the facts,

25  not surprisingly, than the Ninth Circuit, and it does appear

1    that that particular defendant was yelling, was not -- I think

2    it's described that he was not obeying repeated commands over

3    several minutes.  There's plenty of -- there's actually more

4    than one person who views him with a firearm.  Those tips in

5    that case are unequivocal.  They see him with a firearm, and

6    there's a number of them.  And then he starts running for some

7    reason.  I mean, there's a lot of facts there that you can

8    imagine would and do relate to the totality of the

9    circumstances analysis that is required for this Court to do in

10   this case.

11          So, you know, the main argument here is that factually

12   it's distinguishable and that it does not have a direct

13   requirement on this Court.  It's not direct authority for this

14   Court to be able to or not be able to find that there was an

15   arrest in this case or to find that the weapons search of the

16   car in this case was justified.  So, you know, that's the

17   primary thing.  I think if there's particular points of law

18   that relate to the *Vandergroen* case that the Court is

19   interested in, I would like to respond to those more

20   specifically.  I'm not familiar with the *Morris* case that

21   Mr. Pennekamp cited, so I would ask for additional time to read

22   that.

23          THE COURT:  I will allow some supplemental briefing to

24   address the impact of *Vandergroen* and *Morris* on this case.  So

25   we can talk about a schedule at the end of the hearing.

1          In terms of how cooperative or not Mr. Macken was,

2     just help me understand your position factually.  I'll start

3     with Ms. Labaree on this one.  I think the defense

4     characterizes what happened as Mr. Macken simply invoking his

5     Fifth Amendment rights, but the government says he didn't

6     comply with the command to get his hands outside of the

7     vehicle, I don't know for how long exactly the government would

8     say that was, and that during that time when he wasn't

9     complying with the order to show his hands, he was -- it wasn't

10    just generalized furtive movements.  It was movements around

11    the area to the left of the steering wheel that the officers

12    could clearly see.

13         So Ms. Labaree, is it not fair to say that Mr. Macken

14    was uncooperative, at least in that respect, even if he pulled

15    over, didn't speed away?  Even if he ultimately complied with

16    getting out of the car and submitting to handcuffing, there was

17    this period of time where he was not compliant, fair?

18         MS. LABAREE:  No, your Honor.  We're not conceding

19    that point.  I'm not sure if that was clear in my briefing.

20    We're not conceding.  And I have reviewed the various lapel cam

21    footage extensively in an effort to corroborate exactly what

22    the officers are saying.  I've read the reports, and I

23    understand that officers have said, you know, he was moving

24    around.  We could see him put an object in this place.  We

25    don't see that point.  It's not visible in any single one of

1   the cameras.  So to the degree that that again is a decision

2   point, I think we would need an evidentiary hearing in this

3   case to resolve it.

4           THE COURT:  That was my next question, do you need a

5   hearing.

6           MS. LABAREE:  I think on that point we do.  And, you

7   know, I will say that this term "uncooperative" can act as sort

8   of a -- it can often state exactly what the nature of that

9   cooperation is or isn't.  My footnote as to Officer Centella's

10  use of the term was intended to sort of -- as a nod to that --

11  to that use of that language which is uncooperative can mean he

12  didn't cooperate with us wanting to know exactly everything

13  that was in his mind, right?  He didn't want to give a

14  statement.  He wanted to invoke his rights.  And I'm not saying

15  that that's necessarily the extent of the lack of cooperation

16  here, but that's the only thing that they were describing

17  because I understand that the officers do describe a different

18  type of uncooperativeness, but I think that term alone cannot

19  serve as sort of a panacea to just justify the need for more

20  intrusion by law enforcement.

21          THE COURT:  All right.  Understood.

22          So Mr. Pennekamp, on the -- if this is a decision

23  point, something I will decide, you would agree an evidentiary

24  hearing is needed to test the officers' credibility because the

25  Court can't resolve the question of lack of cooperation solely

1    on the record before it?

2            MR. PENNEKAMP:  I think that the Court can resolve

3    this issue on the record before it.  I mean, at this point the

4    government has submitted declarations from each of the three

5    officers.  They told you that they will testify as to the facts

6    stated in their police reports.  So they stand by those facts.

7    And I don't think there's a real dispute other than counsel's

8    argument about what occurred in this case.  The police reports

9    are clear about the kind of noncooperative behavior they're

10   talking about.  They -- and the videos confirm this.

11           Mr. Macken was ordered to put his hands outside the

12   window and keep his hands up.  He was given some subsequent

13   commands about turning off the vehicle and dropping the keys

14   outside the window, but the police reports are unanimous that

15   despite those commands Mr. Macken kept pulling his hands inside

16   the vehicle window outside of the officers' view.

17           And perhaps most concerning, and we didn't discuss

18   this in the briefing, but it's clear in the reports, Mr. Macken

19   was not given a command to open the door.  He nevertheless

20   opened it himself.  So he started to get out of the vehicle

21   before the officers had told him to do so which raises obvious

22   safety concerns for officers responding to an incident where

23   they -- everybody agrees reasonably suspect a weapon to be

24   present.  So he opens the door.  As he's opening the door, as

25   the Court mentioned, this isn't just an individual who is

1   confused about what he's supposed to do about keeping his hands

2   up.  He actually deliberately reaches to the dash compartment,

3   places a dark object in the dash compartment, puts the cover

4   back on, and then continues getting outside the vehicle.

5          So there is an argument from counsel that Mr. Macken

6   was confused, and he was not trying to be noncompliant.  I just

7   don't think that that's reflected in any of the facts before

8   the Court.

9          And I think, you know, to the extent there's a

10  question about how uncooperative one needs to be in order to

11  justify additional uses of force, I mean, it is -- there

12  doesn't have to be yelling and running and kicking and

13  screaming.  In the *United States versus Greene* case that we

14  cite in our brief, the kind of noncooperation that the Ninth

15  Circuit said warranted additional use of force, in that case

16  was the person had been told to put his hands on the headliner

17  of the vehicle, and he didn't do it.

18         So, you know, again we think the kind of noncompliance

19  at issue here combined with the fact that everyone agrees there

20  was reasonable suspicion a weapon was present is the kind of

21  scenario that would authorize the officers to do exactly what

22  they did here which is perform a guns-drawn stop requiring him

23  to exit the vehicle, handcuff him, place him in the back of a

24  patrol vehicle for just a few minutes.  Depending on when you

25  think the stop began, we're talking about three to five minutes

1    before the gun was found.  So again, we think that's -- the

2    Court can make that decision on the record before it right now.

3    I don't know that an evidentiary hearing is going to add

4    anything to the Court's analysis in this case.

5            THE COURT:  All right.  I understand those competing

6    positions.  I'm going to ask my questions, and then you can

7    make brief wrap-up argument if you want, also recognizing

8    you'll have the supplemental briefing opportunity.

9            So on a different question, Ms. Labaree, you referred

10   to it earlier during this hearing, but I gather you are not

11   conceding that the officers were hearing over dispatch the

12   officer who was monitoring the camera and his description; is

13   that right?

14           MS. LABAREE:  No.  Actually, it's my understanding

15   from reading the police reports is that at least two of the

16   officers were able to hear the tip over dispatch.

17           THE COURT:  All right.

18           MS. LABAREE:  To me that actually strengthens our

19   position because there's certain cases such as *Vandergroen*

20   where there's discrepancy potentially between what's reported

21   and then what actually reaches the officers ears.  So in this

22   case they can hear full well the caveats that Y45, the city

23   camera operator, puts into his report of a potential --

24   something, an object that might be a weapon, right?  There's

25   nothing equivocal about it.  So I don't -- that's my read of

1    the police report.

2              THE COURT:  I understand that argument.  So you're not

3    disputing though that the officers did hear the officer

4    monitoring the camera say that he looked -- he thought he saw

5    something black in the shape of a semiautomatic handgun?

6              MS. LABAREE:  I'm not disputing that, no, your

7    Honor.

8              THE COURT:  All right.  And that he could see it on

9    the console?

10             MS. LABAREE:  "It" being the object?

11             THE COURT:  Right.

12             MS. LABAREE:  Yes.

13             THE COURT:  And that he described -- the officers who

14   pulled Mr. Macken over also heard that monitoring officer

15   describe the transaction, the suspicious transaction in the

16   parking lot, correct?

17             MS. LABAREE:  Well, again, we wouldn't concede that

18   it's suspicious, but there's an exchange, correct.  I might

19   just correct the record, my own record on that point.  In

20   reading back through the reply, I realize I perhaps conceded

21   too much because, in reviewing the audio of Y45, it's clear

22   that he makes reference to this man that he sees in the parking

23   lot and that some type of exchange occurs within the vehicle.

24   But that I think in my reply I overstated a bit.  And they say

25   this object was exchanged, and I don't think that that's at all

1    clear from the tip; and that's not what the information was

2    that the officers were operating on during this event.

3            THE COURT:  But the monitoring officer did describe

4    the passenger getting out of the front seat moving to the back,

5    the third person getting in the car.

6            MS. LABAREE:  Correct.

7            THE COURT:  All right.  And the government doesn't

8    dispute that there was some qualifying language in the

9    monitoring officer's description of what that officer thought

10   he was seeing, right, Mr. Pennekamp?

11           MR. PENNEKAMP:  So I mean, to the extent the Court is

12   asking whether we think the camera operator's report was

13   equivocal or was somehow wishy-washy about whether or not a gun

14   was present, I don't think we concede that this was an

15   equivocal report.  I mean, I think this is a trained, retired

16   police officer observing a suspicious exchange and reporting to

17   the best of his ability.  You know, he's not there to hold the

18   gun.  He can't say with a hundred percent certainty that what

19   he saw was a gun, but what he tells the officers over the

20   radio, which they hear, is that he believes he saw an exchange

21   involving an item with a distinctive shape of a semiautomatic

22   firearm.

23           I don't think we think it's equivocal.  To the extent

24   there is any sort of equivocalness to that statement, I don't

25   think it's material to the officers' decision-making process in

1   stopping the vehicle.  In the *Vandergroen* case, which we've now

2   discussed at length, the reports that the officers heard from

3   the bartender tip was -- in the opinion it says the patrons,

4   quote, think they saw a suspect carrying a pistol.  So in that

5   case it wasn't even a definitive, yes, for sure this person one

6   hundred percent has a gun on him.

7        You know, we're all human.  We can't make any

8   statements with any one hundred percent degree of certainty,

9   and I think that's what occurred here.  And, you know, we talk

10  about this in our brief as well.  You know, to the extent it

11  matters as a legal matter, the cases are clear that even

12  probable cause doesn't require one hundred percent certainty.

13  Some equivocation is okay.

14        In this case, you know, the officers heard a report

15  again from a trained law enforcement officer explaining what he

16  saw.  They interpreted that report as this operator has seen a

17  gun exchange.  This is not equivocation in the police officers'

18  understanding of what the operator was telling them.  And so

19  for those reasons, we think again probable cause exists, at the

20  very least reasonable suspicion exists justifying the officers'

21  actions in this case.

22        THE COURT:  All right.  I understand that position.

23  Again, you can return to it in wrap-up if you want.  Just

24  clarifying a few other matters, does the defense agree that the

25  officers didn't need to know that Mr. Macken was a felon for

1    any arrest, if it's an arrest, to be proper, Ms. Labaree?

2           MS. LABAREE:  An arrest based on the presence of the

3    weapon in the car?

4           THE COURT:  (Nods head.)

5           MS. LABAREE:  Correct.

6           THE COURT:  And the defense, I know you address

7    *Michigan v. Long* in your reply, so you agree it's applicable to

8    this case?

9           MS. LABAREE:  It clearly has bearing on this case,

10   yes.

11          THE COURT:  And so even if Mr. Macken was restrained

12   and wasn't going to break away to try to get the gun, the

13   government in a footnote, I believe, points out that, if

14   released, he was going to return to the car where the gun was.

15   Isn't that a factor here, Ms. Labaree?

16          MS. LABAREE:  Your Honor, yes.  And I did address it

17   in the reply.  I think that -- I think that there is something

18   else that has to be analyzed in the context of applying

19   *Michigan v. Long* here, and I attempted to address it, which is

20   that as I note, there's not a single other attempt beyond the

21   intrusiveness of conducting the search of the car to

22   investigate the basis of the stop, and so just because there's

23   a potential weapon involved and just because *Michigan v. Long*

24   says, hey, this person isn't necessarily going to be arrested

25   at this point, it does not give categorical authorization to

1    law enforcement to immediately abdicate their duty to in fact

2    investigate something at a level less than total intrusion.

3    And that's the *United States v. Grigg* case that I quote, that I

4    cite.  It does note that when the court is assessing the

5    reasonableness of the law enforcement's actions, they do look

6    at whether any other options were available.  And that's why I

7    keep pointing to the fact that, as I say in my brief, there's

8    no attempt to verify the details of probation.

9              THE COURT:  I understand that.

10             MS. LABAREE:  And there's no gesture towards anything

11   other than an immediate car search.  One thing I will say in

12   response to Mr. Pennekamp's remarks, you know, it is an

13   equivocal tip.  Y45, the city camera operator, does say it's

14   pretty dark.  It looks like it's the shape of an automatic

15   weapon.  And yet this gets translated in numerous police

16   reports to a full sail there is a gun in this car.  And I don't

17   think that's a mistake.  I think that's because the police

18   officers hearing it don't hear the doubt, and they abdicate

19   their responsibility to rely not only on the certainty embedded

20   in the tip but also on the doubt.

21             So, you know, it is an arrestable offense once they

22   find the weapon even before they know he's a felon, but it's

23   actually a misdemeanor offense at that point, which I note in

24   my motion, and so this entire episode is based on an equivocal

25   tip of a misdemeanor offense.

1          THE COURT:  I understand those arguments, and I

2     understand your position that the officers were required to

3     take those additional steps and the government's position that

4     they weren't.  So I understand those arguments.

5          Let me ask the government.  Just checking a few facts,

6     it's not disputed that officers cleared the car; that is, they

7     did an initial check of the car, didn't see the gun, right?

8          MR. PENNEKAMP:  That's right, your Honor.  I believe

9     four officers are stacked up in line, went and did a very quick

10    sort of protective clearance of the car, and they did not find

11    the gun at that point because it was hidden behind a

12    compartment in the dash.

13         THE COURT:  And it's not disputed either, as the

14    defense points out, the police officers' reports, more than one

15    say the gun was in plain view.  So that's an inconsistency,

16    right?  And is that a red flag again requiring at least probing

17    of the officers' credibility?

18         MR. PENNEKAMP:  I'm sorry, your Honor.  I just lost

19    audio on my headphones unfortunately.  Could you repeat the

20    question about the one after the clearance question.

21         THE COURT:  More than one of the officers say in their

22    written reports that the gun was in quote, unquote, plain view.

23    The defense calls this out in its briefing.  I think

24    undisputed, you agree, the gun was -- it was not just stuck

25    under a dashboard.  There was a cover that had to be opened to

1    find the gun.  So assuming that's correct, why is there not an

2    inconsistency in the officer's reports that would call for an

3    evidentiary hearing if I need to resolve that issue?

4           MR. PENNEKAMP:  Understood.  So we would concede that

5    at the time the gun was found it was not in plain view.  It was

6    definitely covered up by the compartment.  Now to the extent an

7    explanation for the discrepancy needs to be made, I think it's

8    just a trick of timing from each officer's perspective.

9    Officer Clark is the one who immediately after the clearances

10   walked to the vehicle, removed the dash compartment, and saw

11   the gun.  He left the cover off of the dash compartment.  So

12   now the gun is exposed in plain view.  Only later does Officer

13   Centella approach the vehicle, and he looks inside the vehicle

14   and he says, oh, I see the gun.  So his plain view explanation

15   in the report is not some alteration of the facts.  He's just

16   reporting what he saw from his perspective.  This was not a

17   plain view search, so I don't think that that alone would

18   warrant an evidentiary hearing.

19          THE COURT:  And Officer Clark himself never says plain

20   view?

21          MR. PENNEKAMP:  That's correct, your Honor.

22          THE COURT:  Do you agree with that regarding Clark's

23   reporting of the incident after the fact, Ms. Labaree?

24          MS. LABAREE:  Yes, your Honor.

25          THE COURT:  All right.

1    All right.  Finally, for the defense, and then I would

2    allow wrap-up argument, is the government correct that you're

3    abandoning arguments regarding the city camera's capture of

4    images serving as a Fourth Amendment violation and the ongoing

5    search after the gun is found?

6        MS. LABAREE:  Your Honor, we're not challenging the

7    ongoing search because there's nothing revealed that Mr. Macken

8    is being charged for.  You know, I put that in there to sort of

9    point out that there might be other violations going on in the

10   course of the stop that might be of interest in the totality of

11   the circumstances analysis.  We're not calling the initial

12   viewing of the interior of Mr. Macken's car a violation of the

13   Fourth Amendment, no.  But to be clear, I think the reason is

14   not because I don't think that the initial -- that the use of

15   the camera might constitute a search, but because under the

16   controlling law, since it might be in plain view anyway, it's

17   sort of street level without the use of the heightened

18   technology, then we really don't have an argument.  I do -- in

19   any case, I don't like to use the word "abandoned," but we're

20   not going forward with that, no.

21       THE COURT:  I'm just trying to figure out my job.

22   There's nothing for me to resolve there, right?

23       MS. LABAREE:  There's nothing to resolve there,

24   correct.

25       THE COURT:  All right.  I have no other questions.  So

1    I would allow brief wrap-up argument if there's something not

2    covered by the current briefing or our discussion, and then we

3    can set a schedule for supplemental briefing.

4          So Mr. Pennekamp and then Ms. Labaree could have the

5    last word.

6          MR. PENNEKAMP:  Sure.  Just to respond to a few points

7    Ms. Labaree made.  First, on the sort of, quote, dark object

8    language in the camera operator's report, I think, you know, it

9    is -- reasonable minds, I guess, could differ about what the

10   camera operator meant when he said that it was dark and then he

11   said it has the shape of a semiautomatic firearm.  The

12   officer's -- it's pretty clear from the reports, if you look at

13   Officer Centella's report in particular, he says that the

14   camera operator said he saw a dark object in the shape of a

15   gun.  Now again maybe there is a difference of opinion about

16   what the camera operator was attempting to communicate by

17   saying it was dark, but again, it's not a dispute that is

18   material to the decision-making process here.

19         Officers are allowed to make reasonable determinations

20   of a fact of a case in making their reasonable suspicion or

21   probable cause determinations.  And even if we were to say that

22   it was a mistake for the officers to think that the camera

23   operator was saying that the gun was dark versus it's dark

24   outside, that's a reasonable mistake of fact that would not be

25   held against the officers for purposes of determining whether

1    or not reasonable suspicion exists.

2            Now on the question of whether or not this was a

3    misdemeanor versus a felony stop, we would point out that

4    California law makes it a felony offense, not a regular

5    misdemeanor offense to carry a concealed weapon in a vehicle

6    when you are not in lawful possession of the firearm.  This

7    case involves what we would say is a suspicious gun exchange in

8    a parking lot at night involving a person walking up to a

9    vehicle handing a gun to another person and then walking away.

10   That is not how guns are typically lawfully exchanged and

11   possessed, and so we do think that the facts of this case give

12   rise to the belief that this case involved a felony justifying

13   the stop.

14           But again, even if we said that this was a misdemeanor

15   offense, that doesn't change this Court's analysis in this case

16   given that it was a misdemeanor gun crime, and again the

17   *Vandergroen* decision sort of discusses this specific aspect of

18   whether or not it was a misdemeanor versus a felony, it doesn't

19   matter because we're talking about a dangerous situation.

20           Finally, on the *Michigan versus Long* point, which

21   Ms. Labaree made in her remarks about how maybe there was some

22   alternative that the officers could have used to investigate

23   the case further before searching the dash compartment and

24   finding the gun, I would note that the *Michigan versus Long*

25   case specifically addresses this issue and finds that there is

1   no requirement in the *Michigan versus Long* context where you

2   have reasonable suspicion of the presence of a dangerous

3   weapon.  There is no separate requirement that the officers

4   take less intrusive means before conducting that *Michigan*

5   *versus Long* search.

6          The dissent in that case specifically said, well, the

7   officers in *Michigan versus Long* could have done something

8   else.  They could have asked for consent to search, for

9   example.  And the majority rejects that.  Specifically, there's

10  a footnote in the majority opinion at footnote 16 that says,

11  you know, we decline to adopt this sort of less-intrusive

12  approach, and the reason is that, again, when we're talking

13  about reasonable suspicion of the existence of a dangerous

14  weapon in the context of a traffic stop, these are inherently

15  dangerous situations, and the Court didn't want to place

16  officers in a position of having to make these sort of judgment

17  calls about, well, is there something more I can do before I

18  secure this dangerous weapon that I believe exists.

19         So we don't think that's a basis for granting the

20  suppression motion here.  For other reasons we state in our

21  brief, we ask that the Court deny the suppression motion.

22         THE COURT:  All right.  Ms. Labaree.

23         MS. LABAREE:  Yes.  So I think when this Court asked

24  the government earlier, you know, does the government dispute

25  that there's some sort of equivocation embedded in the tip

1    itself, the government said no, to the degree that, you know,

2    there is language saying there appears to be a firearm,

3    et cetera, but it appears that every time this issue keeps

4    coming back up, the government sort of argues these absolutes.

5    So either it's important to the legal analysis that there's

6    equivocation or it's not.  Our client -- our position is

7    clearly that it is important to the legal analysis that there

8    is equivocation and that we think it's clear equivocation in

9    the tip.  So I just want to sort of point that out.

10          This whole thing about the dark object, you know, the

11   reality is that it -- it's clear that from the police officers'

12   reports that they heard this tip.  They translated it

13   immediately into a definite weapon.  I think that seems to be

14   what's true.  Whether that's reasonable or not is another

15   question, and that goes to -- back to the defense request for

16   an evidentiary hearing to the degree that credibility of

17   officers is at issue here.  And the government offers much

18   speculation as to why Officer Centella may have wrote his

19   report that, what they meant by cooperative.  Apparently it's

20   very clear what they meant by uncooperative from reading the

21   reports.  If there are factual issues that the defense does not

22   concede that the police -- various police say in their reports,

23   I think that's a factual issue that needs to be resolved to the

24   degree that it might affect this Court's ruling.  So we would

25   just reiterate our request for that.

1          Also as to this point regarding a felony stop versus a

2    misdemeanor stop, you know, at the time that the officers

3    pulled Mr. Macken over, all they knew was that there was maybe

4    a weapon in the car.  None of the aggravators making this a

5    felony stop -- a felony were present or known to the officers

6    at the time.  So I think that's abundantly clear, and I'm not

7    sure why we're even discussing whether or not they would have

8    that knowledge because I think it's very, very clear and

9    undisputed that all they had at that time was an unknown

10   person.

11         And another thing is I don't -- I really don't want

12   the record to be messed up on this point which is that the

13   government keeps using the term "gun exchange" when the

14   government discusses -- the Y45 reports that he witnesses when

15   the other man comes up to the car.  I quote exactly what the

16   audio says in my original motion, and he says he was talking to

17   another guy, that he just walked off.  They did kind of an

18   exchange within the vehicle.  The guy walked off.  So there's

19   just simply not a basis for the government to argue that this

20   was a gun exchange.  That's certainly something that the

21   officers can elaborate on if that appears to be a materially

22   important fact, but it's not in the record right now.

23         THE COURT:  And when you say a "gun exchange," you

24   mean two guns being exchanged?

25         MS. LABAREE:  The way that I read -- the way that I

1    heard it is the exchanged guns in the vehicle.  At least the

2    way that I understand the government to be using that phrase is

3    that the exchange in the vehicle is of the weapon, is of the

4    object that might be a weapon.

5            THE COURT:  All right.  So gun for gun, could have

6    been gun for money or just --

7            MS. LABAREE:  Object.  By exchange, I think it meant

8    handoff, right?  Like I don't -- I'm not being super specific

9    about that, but I think the point here is just that is not the

10   substance of the tip.  That is not what was said.  That is not

11   the information that officers had at that time.

12           THE COURT:  All right.  I understand that issue.  But

13   on the misdemeanor point, just so I'm clear, is also part of

14   what you're saying is because they didn't know anything about

15   the person in the car, they also couldn't rule out the

16   possibility the person had a CCW permit?  Is that what you're

17   saying?

18           MS. LABAREE:  No.  I'm not saying that.  I am not

19   contesting the point that currently in California CCW's are so

20   rare that, you know, it is presumptively a crime to see

21   somebody carrying a weapon that is concealed, okay?  But the

22   California Penal Code that's being cited, I think it's 24500,

23   that is concealed carry.  That's the illegal concealed carry,

24   and it is a misdemeanor under that statute without specific

25   aggravators.  One of those aggravators might be that you're a

1    felon, right?

2            THE COURT:  Okay.

3            MS. LABAREE:  You know, and again, just in terms of

4    *Michigan v. Long*, I think this idea that the government said,

5    you know, the Supreme Court recognized that these are

6    inherently dangerous situations.  Well, you know, there are

7    certain facts in *Michigan v. Long* that are akin to the facts in

8    Mr. Macken's case, and there are some that are not.  And so to

9    the degree that we can just simply lump it all together and

10   say, oh, this fits under *Michigan v. Long*, and therefore, in

11   this particular case based on these specific facts under the

12   totality of the circumstances in this specific case a

13   protective search was justified.  I just don't think that's

14   what *Michigan v. Long* stands for.  It doesn't create a

15   categorical rule there.

16           And I think that's what's difficult about the Fourth

17   Amendment analyses is that there is -- there are very few

18   categorical rules.  And as I point out in my motion, there's

19   also no categorical rule that where a weapon is present, sort

20   of no holds barred, you can search as quickly as you want, you

21   have no obligation to do any other type of investigation, you

22   have no obligation to sort of reduce the intrusiveness no

23   matter how flimsy or how full of doubt the tip is.

24           So, you know, the motion here is really based on the

25   level of intrusion from start to finish of this stop and

1    whether the knowledge of the police officers at the time they

2    were taking each step justified that level of intrusion, and

3    our argument is that it did not.

4          THE COURT:  I understand that argument.  This has been

5    very helpful.  Thank you.

6          What kind of schedule do you need for supplemental

7    briefing, and how do you want it to proceed?  Is simultaneous

8    all right, or do you want serial briefing, Ms. Labaree?

9          MS. LABAREE:  I would be fine with simultaneous, your

10   Honor.

11         THE COURT:  All right.  And then how long would you

12   need for a supplemental brief?

13         MS. LABAREE:  I'd like to say two weeks, although I

14   apologize to Mr. Macken who is watching me ask for more time,

15   but I think to do a fair job I would like two weeks.

16         THE COURT:  So August 3rd.  Mr. Pennekamp, that work

17   for you?

18         MR. PENNEKAMP:  It does, your Honor.  I would ask for

19   clarification, specifically what you would like us to

20   supplement.  My understanding is you want us to respond to the

21   application of the *Vandergroen* case and the *Morris* case.  Is

22   there something else you would like us to address?

23         THE COURT:  No.  It's really for that limited purpose,

24   supplemental briefing explaining how the Ninth Circuit's

25   decision now in *Vandergroen* applies to this case and also the

31

1    *Morris* case Mr. Pennekamp mentioned for the first time.

2              You got the cite for that, Ms. Labaree?

3              MS. LABAREE:  I did, yes.  Thank you.

4              THE COURT:  All right.  So also addressing *U.S. v.*

5    *Morris*, each of you may in writing explain how you believe that

6    case relates to this one.  I would say you could do that in ten

7    pages max.  Fair, Ms. Labaree?

8              MS. LABAREE:  That's fine, yes.

9              THE COURT:  Mr. Pennekamp?

10             MR. PENNEKAMP:  Yes, your Honor.  That should be more

11   than sufficient.

12             THE COURT:  All right.  So ten pages by August 3rd and

13   then we can set this for further status on August 10th.

14             Ms. Labaree?

15             MS. LABAREE:  That's fine, your Honor.  Thank you.

16             THE COURT:  Mr. Pennekamp?

17             MR. PENNEKAMP:  Your Honor, I am supposed to be on

18   vacation that day, but if we're doing this by Zoom, I think I

19   should be able to appear.

20             THE COURT:  You know, once it's submitted -- upon the

21   submitting of supplemental briefing, it will be submitted.  I'm

22   noting that this was set for both motion hearing and status.  I

23   guess let me clarify.  Typically the Court has under the Speedy

24   Trial Act up to 30 days to resolve a motion.  So the other

25   option would be to set a status out with sufficient time for

1    the Court to attempt to resolve the motion, so setting it for

2    mid-September.  Any objection to that, Ms. Labaree, so that you

3    know hopefully by the September date how I've decided the

4    motion?

5         MS. LABAREE:  In light of the fact that my client is

6    in custody, your Honor, I would object to such a far-out

7    schedule, and in fact, I would be okay with a week's deadline

8    to the briefing if it meant that we could come back to court

9    and take the ruling on August 3rd.

10        THE COURT:  Well, I think it's better to stick with

11   August 10th if we're going that direction, and I could see if I

12   could be ready with a bench order.  That might be possible.

13        And Mr. Pennekamp, there's no one else who could cover

14   for you if for some reason you couldn't connect from wherever

15   you are?

16        MR. PENNEKAMP:  I will be able to cover the hearing,

17   your Honor.  I'm not traveling anywhere, if that's what you're

18   asking.

19        THE COURT:  All right.  Well, you volunteered that.  I

20   realize it has implication given the current public health

21   orders.

22        All right.  Well, August 10th then for further status,

23   and I'll look for your supplemental briefing.  And I will see

24   if I can get to a bench order by then.

25        All right.  Anything further, Mr. Pennekamp?

1          MR. PENNEKAMP:  No, your Honor.  Thank you.

2          THE COURT:  Ms. Labaree?

3          MS. LABAREE:  No, your Honor.  Thank you.

4          THE COURT:  All right.  You may sign off.

5          THE CLERK:  Court is in recess.

6          (The proceedings adjourned at 10:37 a.m.)

7                              --oOo--

8    I certify that the foregoing is a correct transcript from the

9    record of proceedings in the above-entitled matter.

10                         /s/ Kacy Parker Barajas

                        _____
11                         KACY PARKER BARAJAS
                        CSR No. 10915, RMR, CRR, CRC
12

13

14

15

16

17

18

19

20

21

22

23

24

25