UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| United States of America, | No. 2:20-cr-00023-KJM |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| Lawrence Macken, | |
| Defendant. | |

Defendant Lawrence Macken moves to dismiss the indictment based on his claim that Stockton Police lost potentially exculpatory evidence. *See* Mot. Dismiss, ECF No. 109. Because he has not shown the evidence was lost or destroyed in bad faith, **the motion is denied.** *See Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). The court does find, however, that one or more alternatives to dismissal may be appropriate to reduce the harm the loss may have caused to Macken's defense. As explained in this order, the court grants Macken's request to take judicial notice of four facts and permits him to renew his requests for remedial jury instructions and an order barring certain evidentiary challenges at an appropriate juncture.

**I.   BACKGROUND**

After dark on a winter night about a year and half ago, a camera operator working for the City of Stockton, California, was watching video coming through from one of the City's surveillance cameras. *See* Ezell Aff. ¶ 8, ECF No. 1. He watched as a man leaned into the open

1

1   door of a parked car.  Centella Rep. at 5, Mot. Dismiss Ex. D, ECF No. 109-1; *see also* Photos &
2   Video Still, Opp'n Mot. Revoke Ex. 3, ECF No. 86-3.  The man handed something that looked
3   like a gun to the driver.  *See* Centella Rep. at 5; Photos & Video Still, *supra*.

4         The camera operator contacted a police dispatcher as the car drove away.  Centella Rep. at
5   4.  Several Stockton Police officers soon arrived and stopped the car.  *See id.*; Clark Report at 1,
6   Clark Decl. Ex. A, ECF No. 23-4; Hall Rep. at 1, Hall Decl. Ex. A, ECF No. 23-5.  The driver,
7   who turned out to be Macken, at first followed the officers' commands to show them his hands.
8   But in reports the officers later prepared, they said he pulled one or both hands back into the car,
9   opened the door, and hid something in the dashboard.  *See* Centella Rep. at 4; Clark Rep. at 1;
10  Hall Rep. at 1.  Officers also said they had seen Macken tucking something black inside the
11  dashboard when they later approached the car.  *See, e.g.*, Centella Video at 5:45, Mot. Dismiss
12  Ex. A (lodged); Hall Video at 1:20, Mot. Release Grand Jury Tr. Ex. 1 (lodged).  Officers ordered
13  Macken and his passenger, Victoria Nellis, out of the car, restrained them both and held them in
14  patrol cars.  *See* Clark Rep. at 1.  Then, searching the car Macken had been driving, they found a
15  loaded handgun.  *See id.*; *see also* Paintball Gun Photos, Mot. Ex. E, ECF No. 109-1.  In their
16  reports, two of the officers wrote that the gun had been hidden behind a panel in the dashboard on
17  the driver's side.  *See* Hall Rep. at 1–2; Clark Rep. at 1.  However, another said he "noticed" the
18  handgun "in plain view."  Centella Rep. at 4.

19        Officers also found a paintball gun in the car.  *See id.*; Paintball Gun Photos, *supra*, Ex. E
20  at 4.  It was not hidden.  They took pictures of it inside the car, sitting on the driver's seat.  *See*
21  *id.*; Gray Rep. at 1, Reply Ex. 1, ECF No. 146-1.  Like the handgun, it was black.  *See* Paintball
22  Gun Photos, *supra*, Mot. Dismiss Ex. E at 4.  From at least some angles, it appeared to
23  approximate the gun-like object in the surveillance camera video and the handgun that had been
24  hidden in the dashboard.  *See id.*; *see also* Photos & Video Still, *supra*.

25        After giving *Miranda* warnings, officers asked Macken and Nellis about the handgun.
26  Macken said he had not known there was a handgun in the car, and only knew about a paintball
27  gun.  Centella Rep. at 4.  He denied he had hidden a handgun in the dashboard.  *See id.*  Nellis
28  told the officers the handgun did not belong to her, and she said she had not known it was in the

1  car. *See* Mot. Suppress Ex. A at 13:20–13:37; *id.* Ex. B at 1:37–1:57; *id.* Ex. C at 3:00–3:40, *see*
2  *also* Mot. Dismiss at 4–5 (transcribing relevant portions of Exhibits A, B and C). Nellis also said
3  Macken had not been trying to hide the handgun; what the officers had seen was Macken moving
4  the paintball gun onto the seat. *See* Mot. Dismiss *id.* at 4.

5        Police tested the handgun and magazine for fingerprints. None were recovered. *See* Gray
6  Rep. at 1. Officers also swabbed the gun, magazine and ammunition for DNA. *See id.* It is
7  unclear whether the swabs were ever tested or whether any DNA was recovered. The paintball
8  gun, by contrast, was not tested for fingerprints or DNA. *See id.* And although two of the
9  officers said Macken had removed a panel covering the compartment where they found the gun,
10 police did not look for fingerprints or DNA on that panel either. *See id.*

11       Officers arrested Macken and he was then held in the San Joaquin County Jail after a
12 records check confirmed he had previously been convicted of a felony. *See* Centella Rep. at 5.
13 The handgun, magazine and ammunition were booked into evidence, but not the paintball gun.
14 Gray Rep. at 1; Property Tags, Reply Ex. 5, ECF No. 146-1; Pennekamp Email (Mar. 13, 2020),
15 Mot. Dismiss Ex. G at 3, ECF No. 109-1. The paintball gun was left in the car, which was towed.
16 Centella Rep. at 5; Pennekamp Email (Mar. 13, 2020); *see also* Pennekamp Email (Mar. 27,
17 2020), Mot. Dismiss Ex. H at 1, ECF No. 109-1. The paintball gun is now lost. According to
18 Macken's sister, it was not in the car when she retrieved it from the towing company the next day.
19 *See* D. Macken Decl. ¶ 7, Mot. Dismiss Ex. F, ECF No. 109-1. The car's windows were down, it
20 was wet inside, panels had been torn away, and damp clothing littered the interior. *See id.* ¶ 6.
21 Her mother's jewelry had also been in the car, but was missing. *Id.* ¶ 7.[1]

22       A federal grand jury later returned an indictment charging Macken with one count: a
23 violation of 18 U.S.C. § 922(g)(1), which prohibits those who have been convicted of a felony
24 from possessing a firearm. Indictment, ECF No. 7. Macken now moves to dismiss the

---

[1] The government's request for an evidentiary hearing to cross-examine Ms. Macken is denied. *See* Opp'n at 11 n.4, ECF No. 131. The inconsistencies it describes in her testimony do not call the credibility of the statements cited here into question. The relevant portions of her declaration describe the car and what was missing from it on the day after police found the handgun. The government does not argue her statements about the car or paintball gun are false, and it has not cited evidence undermining those claims.

indictment, arguing that because the government lost the paintball gun, he cannot use it to support his claims that he did not know the handgun was in the car, that officers did not see him hiding the handgun, and that the gun-like object in the surveillance video was the paintball gun. *See* Mot. Dismiss at 9–12. The government opposes the motion, which is fully briefed. *See* Opp'n, ECF No. 131; Reply, ECF No. 146.

The court heard oral arguments by videoconference after requesting the parties come prepared to discuss whether an alternative sanction to dismissal should be imposed and if so what that sanction should be. *See* Hr'g Mins., ECF No. 156; Min. Order, ECF No. 157. At the hearing, Macken proposed that the court take judicial notice of certain facts about the paintball gun as an alternative to dismissal. The court permitted Macken to file a supplemental brief to explain his proposal. *See* Def.'s Suppl. Br., ECF No. 162.

**II.    LEGAL STANDARD**

The government may not keep potentially exonerating evidence from a criminal defendant in bad faith. *See Youngblood*, 488 U.S. at 57–58; *California v. Trombetta*, 467 U.S. 479, 488–89 (1984). If it does, a defendant may move to dismiss an indictment. *See United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993). To succeed in such a motion, the defendant must prove three things: (1) the evidence had "an exculpatory value that was apparent before the evidence was destroyed," *Trombetta*, 467 U.S. at 489; (2) "comparable evidence" cannot be obtained "by other reasonably available means," *id.*; and (3) the government acted in bad faith, *Youngblood*, 488 U.S. at 58.

**III.    DISCUSSION**

    **A.    Dismissal**

The lost paintball gun was "potentially exculpatory evidence." *Trombetta*, 467 U.S. at 481. If the paintball gun had not been lost, it could have been "expected to play a significant role in [Macken's] defense." *Id.* at 488. For example, Macken could have tested it for fingerprints. If he had then found his fingerprints on the paintball gun, those prints would have corroborated his claim that the camera operator and police had seen him picking up and moving the paintball gun, not the handgun, which, after all, did not bear his fingerprints. If the paintball

4

1  gun had not been lost, he could also have used to recreate the scene captured by the city
2  surveillance camera.  The recreation might have supported his claim that the video shows him
3  taking and holding the paintball gun, not the handgun; at the very least it might have
4  demonstrated it is impossible to know which gun is which.

5        The paintball gun's potential value was also apparent at the time.  The officers' suspicions
6  of wrongdoing had two sources: the surveillance video showing what looked like a gun and
7  Macken's hand movements after he was stopped.  The officers would have understood that
8  Macken's guilt depended on whether he had an innocent explanation for the images caught on
9  video and his hand movements.  The paintball gun was the prime candidate for that explanation.
10 It was a similar color, similar shape, and similar size as the handgun.  Macken and Nellis both
11 told police they knew about the paintball gun, but not the handgun, and Nellis said officers had
12 seen Macken moving the paintball gun, not the handgun.  The exculpatory value of evidence is
13 apparent if "repeatedly suggested to government agents" this way.  *Cooper*, 983 F.2d at 931; *see*
14 *also, e.g.*, *United States v. Zaragoza-Moreira*, 780 F.3d 971, 979 (9th Cir. 2015) (holding value
15 of lost evidence was apparent at time because defendant had "repeatedly alerted [the officer] to
16 her duress claim and the potential usefulness of the pedestrian line video footage").

17       The government argues the paintball gun has no power to exonerate Macken because
18 possessing a paintball gun is no defense to possessing a firearm.  *See* Opp'n at 5.  This argument
19 sidesteps Macken's theory of the paintball gun's relevance.  His argument is not that possession
20 of a paintball gun disproves possession of a firearm.  He argues that tests he could have
21 performed on the paintball gun might have undercut evidence the government would present to
22 show he "consciously possessed what he knew to be a firearm," which is an element of an offense
23 under § 922(g)(1), *United States v. Beasley*, 346 F.3d 930, 934 (9th Cir. 2003).  The paintball
24 gun's loss deprived Macken of evidence to support his claim that he did not handle or hide the
25 handgun and thus respond to compelling evidence of knowing possession.  And without the
26 paintball gun, he will be hampered in explaining the gun-like object in the surveillance video and
27 the hand movements police wrote about in their reports, which is also evidence that might show
28 knowing possession.

Macken attacks the government's position by contending it wrongly redefines "exculpatory" to mean "exonerating." *See* Reply at 2–3. "Whether an exculpatory item of evidence moves the ball forward an inch or a mile," he argues, "it must be preserved and made available to the defense" so long as "its value in increasing the probability of innocence is apparent." *Id.* at 2. This argument takes *Trombetta* too far. In that case, the defendants argued the government had deprived them of due process by not preserving samples of the air they had breathed into "Intoxilyzer" devices used to measure blood-alcohol content. *See* 467 U.S. at 482–83. The Court perceived no constitutional problem, among other reasons because "the chances [were] extremely low that preserved samples would have been exculpatory." *Id.* at 489. If even an inch's worth of potential exculpatory value had qualified, as Macken now argues, then the Supreme Court would have had no reason to say how low or high the defendants' chances were.

Macken's argument also conflicts with the Supreme Court's reasoning in *Youngblood*. In that sexual assault case, in which the Court observed law enforcement's failure to preserve clothing and semen samples was "at worst" negligent, one reason the Court decided to require proof of the government's bad faith was to limit "the extent of the police's obligation to preserve evidence." 488 U.S. at 58. The Court intended to confine police obligations to the "class of cases" in which "justice most clearly requires it." *Id.* Macken's proposed rule, by contrast, would require the government to preserve all potentially exculpatory evidence, even evidence that might lessen the probability of guilt only slightly. The vocabulary of the Court's holding in *Youngblood* also undermines Macken's argument. The Court described the type of bad faith it envisioned as apparent only when the police showed "by their conduct . . . that the evidence could form a basis for *exonerating* the defendant." *Id.* (emphasis added).

Regardless, the inch-versus-mile line-drawing exercise is unnecessary here because Macken has established the paintball gun was "potentially exculpatory evidence" under *Trombetta*, 467 U.S. at 481. The logical chain to that conclusion is strong: To convict Macken at trial, the government must prove each element of the charged offense beyond a reasonable doubt. *Sullivan v. Louisiana*, 508 U.S. 275, 277–78 (1993). One element of the charged offense is knowing possession of a firearm. *Beasley*, 346 F.3d at 934. Here, the government might rely on

1  two sources of evidence to prove Macken knowingly possessed a firearm: video of an object that
2  looked like a gun in Macken's car soon before he was stopped and his attempts to move
3  something black around near a dashboard panel where a firearm was found.  The government's
4  failure to preserve the paintball gun deprived Macken of tests that might raise reasonable doubts
5  about this evidence.  He cannot compare the paintball gun, held at the same angle at a similar
6  distance in the same light, with the object in the surveillance video.  He cannot attempt to contrast
7  the presence of his fingerprints on the paintball gun with the absence of his fingerprints on the
8  dashboard panel and handgun.  These are "tests, the results of which might have exonerated
9  [him]."  *Youngblood*, 488 U.S. at 57.

10  Macken has also satisfied the second condition of proving a due process violation under
11  *Trombetta* and *Youngblood*: the absence of comparable evidence from other sources.  *See*
12  467 U.S. at 489.  Pictures and testimony about the paintball gun are poor substitutes for the
13  paintball gun itself because pictures and testimony cannot prove anything about fingerprints.  Nor
14  would the government's proposed stipulation be comparable evidence.  As confirmed at hearing,
15  the government offers only to stipulate that Macken possessed the paintball gun and that his
16  fingerprints may have been found on it, not that they were.  In addition, only a few pictures of the
17  paintball gun have been preserved, and these pictures do not permit enlightening comparisons
18  with the surveillance video images.  Nor do they depict any distinguishing features that might
19  allow the defense to obtain an identical gun for testing.

20  Macken has thus satisfied the first two conditions of proving a due process violation.  He
21  has not, however, satisfied the third, i.e., the government's bad faith.  "Bad faith requires more
22  than mere negligence or recklessness."  *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).
23  Officers should have preserved the paintball gun as they did the handgun and its ammunition.
24  The paintball gun's relevance and potential usefulness were obvious.  But police did not destroy
25  the paintball gun or discard it.  They left it in the car, which was towed.  No evidence suggests
26  officers expected the paintball gun to be lost or destroyed.  The court cannot conclude on this
27  record that they acted in bad faith or with "malicious intent."  *United States v. Estrada*, 453 F.3d
28  1208, 1213 (9th Cir. 2006) (concluding government had not violated defendant's due process

rights because lost vehicle had been sold without government's knowledge or request).  The motion to dismiss is denied.

### B. Alternative Sanctions to Dismissal

If the government did not act in bad faith, and therefore did not violate the defendant's constitutional rights, a district court "may still impose sanctions including suppression of secondary evidence." *Flyer*, 633 F.3d at 916.  The court may also give a "remedial jury instruction." *United States v. Sivilla*, 714 F.3d 1168, 1174 (9th Cir. 2013).  "[T]he court must balance 'the quality of the Government's conduct and the degree of prejudice to the accused.'" *Flyer*, 633 F.3d at 916 (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring)).[2]  "The Government bears the burden of justifying its conduct and the defendant bears the burden of demonstrating prejudice." *Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring).

Several factors might be relevant in assessing the government's conduct:

> 1. Whether the evidence was lost while it was in the government's custody,
>
> 2. Whether the government "acted in disregard for the interests of the accused,"
>
> 3. Whether the government "was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions,"
>
> 4. If the government's actions were deliberate, "whether they were taken in good faith or with reasonable justification," and
>
> 5. The "degree of federal participation" and whether the government attorneys prosecuting the criminal case "participated in the events leading to loss or destruction of the evidence."

*See id.*  Here, the paintball gun evidence was not lost while it was in police custody.  It was lost in the lot where the car was stored after being towed.  Nothing suggests the loss was deliberate.  No

---

[2] "*Loud Hawk* is an en banc decision with several opinions.  The rule governing sanctions for destruction of evidence is found in [then] Judge Anthony Kennedy's 6–5 concurrence." *Sivilla*, 714 F.3d at 1173.  An unrelated jurisdictional aspect of the decision in *Loud Hawk* was overruled in *United States v. W.R. Grace*, 526 F.3d 499, 502 (9th Cir. 2008) (en banc).

government attorneys prosecuting this case participated in the events leading to the loss. Stockton police did, however, act with disregard to Macken's rights in failing to preserve the paintball gun. Their decision to send the car away without testing the paintball gun for fingerprints or DNA and without securing the car's contents was negligent or reckless given the paintball gun's obvious relevance. Police demonstrated disregard for Macken's rights by selectively preserving evidence that inculpated him. On balance, the government has not justified the officers' conduct.

The court therefore turns to prejudice. It "must consider a wide number of factors including, without limitation":

> 1. The "centrality of the evidence to the case" and the "importance" of the evidence "in establishing the elements of the crime or the motive or intent of the defendant";
>
> 2. "[T]he probative value and reliability of the secondary or substitute evidence";
>
> 3. "[T]he nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused"; and
>
> 4. "[T]he probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence."

*Id.* Here, the paintball gun's absence is unlikely to invite speculation or bias against Macken, but the other relevant factors weigh in favor of a sanction. As explained above, the paintball gun was central to Macken's defense and important in refuting the government's allegation of knowing possession. Secondary evidence is not as weighty or reliable as the lost paintball gun itself or the results of any tests Macken would conduct on it. The loss potentially deprived him of powerful evidence.

What remains, then, is to decide on an appropriate remedy. Macken proposes to exclude all of the inculpatory evidence officers preserved, from police statements about the handgun and Macken's hand motions to the video captured by the city's surveillance cameras. *See* Reply at 12

/////

n.3. The exclusion he requests would be a dismissal in all but name. The court declines to award him that remedy.

Macken also proposes three alternatives to dismissal and exclusion. First, he requests remedial jury instructions. One or more remedial instructions may be appropriate. He may propose specific remedial jury instructions at an appropriate juncture and the court will entertain his proposal.

Second, Macken moves to bar the government from challenging the selective introduction of his own statements about the paintball gun. The court cannot grant or deny that request without considering which statements Macken wishes to introduce and without hearing from the government in response to his proposal. He may renew this request at an appropriate time by identifying specific statements, such as by filing a motion *in limine*.

Third, Macken proposes the court take judicial notice of four facts:

> 1. A hand-gun style paintball gun, dark in color, was found on the driver's seat of Mr. Macken's vehicle at the time of his arrest.
>
> 2. Mr. Macken was not prohibited from possessing a paintball gun.
>
> 3. Mr. Macken asserted repeatedly to law enforcement at the time of arrest that the only "gun" he had was the paintball gun.
>
> 4. Law enforcement failed to preserve the paintball gun as evidence despite its immediately apparent value as exculpatory evidence.

Def.'s Suppl. Br. at 2.

A court may take judicial notice of any fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The parties do not dispute the first three of these proposed facts, and the court concludes they are subject to no reasonable dispute given the evidence described in section I above. It is also undisputed that law enforcement failed to preserve the paintball gun as evidence, and the court has found above that the paintball gun's value as exculpatory evidence was immediately apparent. Macken's proposal to take judicial notice is granted.

## IV. CONCLUSION

**The motion to dismiss is denied.** As an alternative to dismissal, the court orders as follows:

1. At an appropriate later date, Macken may:
    (a) Propose remedial jury instructions.
    (b) Renew his request to bar the government from challenging the selective introduction of his own statements about the paintball gun.
2. The court takes judicial notice that:
    (a) A hand-gun style paintball gun, dark in color, was found on the driver's seat of Mr. Macken's vehicle at the time of his arrest.
    (b) Mr. Macken was not prohibited from possessing a paintball gun.
    (c) Mr. Macken asserted repeatedly to law enforcement at the time of arrest that the only "gun" he had was the paintball gun.
    (d) Law enforcement failed to preserve the paintball gun as evidence despite its immediately apparent value as exculpatory evidence.

This order resolves ECF No. 109.

IT IS SO ORDERED.

DATED: August 23, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE